STATE of Missouri, Respondent,

v.

**Billy DUREN, Appellant.**

**No. 59914.**

Supreme Court of Missouri, en banc.

Sept. 27, 1977.

Rehearing Denied Oct. 11, 1977.

Lee M. Nation, Kansas City, for appellant.

Nanette K. Laughrey, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Defendant, convicted of murder first degree and assault with intent to kill was sentenced to consecutive terms of life imprisonment. He appealed to the Missouri Court of Appeals, Kansas City district, raising questions of constitutional construction and because those issues fell within the exclusive appellate jurisdiction of the Supreme Court under Art. 5, § 3, Mo.Const. as amended in 1976, the cause was transferred here prior to opinion. Two assignments of error are presented: (1) failure to quash the jury panel because Missouri's jury selection process systematically excludes women, and (2) erroneous joinder and trial of the murder and assault charges. We affirm.

The case arose from defendant's fatal shooting of Carrol Riley and wounding of Lee Kinnison during an attempted robbery at a United States Post Office in Jackson County, Missouri. Riley, attempting to thwart the crime, was shot in the head by defendant who turned and then shot Kinnison, a bystander. Sufficiency of the evidence to support the verdict is not challenged.

## THE JURY SELECTION ISSUE

Defendant first contends his motion to quash the petit jury panel was erroneously overruled in that Art. I, § 22(b), Mo.Const.[1] and its implementing statute § 494.031(2), RSMo Supp.1975,[2] served to exclude women from the jury in such numbers as to render those sections invalid and destroy the panel's efficacy under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.[3] The Sixth Amendment has recently been interpreted in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), to invalidate constitutional and statutory provisions of Louisiana relative to jury selection procedures. The voided sections were Art. VII, § 41 of the Louisiana Constitution:

> "[N]o woman shall be drawn for jury service unless she shall have *previously filed with the clerk* of the District Court a *written declaration of her desire* to be subject to such service." (Emphasis supplied.)

and Art. 402, Louisiana Code of Criminal Procedure:

> "A woman shall not be selected for jury service *unless she has previously filed* with the clerk of court of the parish in which she resides *a written declaration of her desire* to be subject to jury service." (Emphasis supplied.)

Examining those constitutional and statutory provisions the Court stated, "Accepting petit jurors from voter registration lists was held constitutionally permissible in *State v. Parker*, 462 S.W.2d 737 (Mo.1971), except in cases that result in the "systematic exclusion of a 'cognizable group or class of qualified citizens'" [l. c. 738]. That case relied in part on *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), which was later overruled in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Defendant argued in *State v. Smith*, 467 S.W.2d 6 (Mo.1971), that based on mathematical probabilities the exclusion of all women from seventy-one talesmen called, made a case of intentional discrimination, but the court reversing, deemed it unnecessary to rule the point as it found from the sheriff's testimony clear evidence of impermissible "intentional exclusion". More recently the court in *State v. Wright*, 476 S.W.2d 581 (Mo.1972), upheld Missouri's jury selection system against attack based on the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States, finding no showing of sex-based class disparity had been made.

1. Mo.Const. Art. I, § 22(b) provides: "No citizen shall be disqualified from jury service because of sex, but the court shall excuse any woman who requests exemption therefrom before being sworn as a juror."

2. § 494.031, RSMo Supp.1975—Pertinent portions of the statute are as follows: "The following persons shall, upon their timely application to the court, be excused from service as a juror, either grand or petit: . . . (2) Any woman who requests exemption before being sworn as a juror; . . . .."

3. Women first became eligible for jury service in Missouri under the Constitution of 1945. Cases challenging jury composition on the basis of sex soon followed. In *State v. Taylor*, 356 Mo. 1216, 205 S.W.2d 734 (1947), failure to include women among those summoned as prospective jurors was held not to be error on the rationale that the new state constitutional provision and implementing statutes permitted but did not require that women serve. To similar effect see *Parker v. Wallace*, 431 S.W.2d 136 (Mo.1968). Three years later, the selection of

as we do, however, the view that the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community, we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male" [l. c. 537, 95 S.Ct. l. c. 701]. Defendant had moved to quash the petit jury venire of St. Tammany Parish, where he was indicted, and in connection with his motion the following facts were stipulated: (1) 53% of persons eligible for jury service in the parish were women but not more than 10% of the names in the wheel were those of women; (2) during a period 4 months prior and 6½ months following trial, 1,800 names were drawn to fill parish petit jury venires and of that number only 12 (less than 1%) were female; (3) 175 male but no female names were drawn for jury service in April, 1972 (the month of trial); and (4) the disparity between eligible women and those included in wheel and venire resulted from the operation of the cited constitutional and statutory sections.

■ The thrust of *Taylor* is that no longer in criminal cases may women as a class be excluded from jury service or automatically exempted on the basis of sex, if as a consequence, jury venires are almost totally male. The Louisiana automatic exemption found constitutionally infirm required women to come forward and file with the district court clerk written declarations stating their desire or intention to serve as jurors, otherwise their names would *not* be included. Such affirmative action, not required of Louisiana male citizens, resulted in almost totally male criminal jury venires and the effective exclusion of females.

■ The Court made clear, however, that "[t]he States remain free to prescribe

relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community" [l. c. 538, 95 S.Ct. l. c. 701].[4] Also, while juries must be drawn from a source fairly representative of the community, no requirement was imposed "that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition . . ." [l. c. 538, 95 S.Ct. l. c. 702].

■ Proper exemptions from jury service are permitted to promote the orderly and efficient operation of overloaded judicial systems. Under § 494.020, RSMo Supp. 1975, a number of classes are excluded from jury service.[5] In addition to excluded classes, § 494.031, RSMo Supp.1975, allows others to be excused on timely application to the court; for example, persons over 65 years of age; doctors of medicine, osteopathy, chiropractic and dentistry; clergy; professors and teachers in any school or institution of learning. Also, Art. I, § 22(b) Mo.Const. mandates that the court shall excuse any woman requesting exemption before being sworn, and this provision is implemented by § 494.031(2), RSMo Supp. 1975. It is this female privilege to opt for excuse from jury service toward which defendant directs his complaint.

■ Examining defendant's contention, we first must emphasize that in Missouri, women's rights to serve on juries are fully protected and equal to those of men. Art. I, § 22(b) Mo.Const. provides that "[n]o citizen shall be disqualified from jury service because of sex . . . ." Thus the rights of Missouri's male and female citizens to serve as jurors, without class discrimination, are constitutionally insured. This constitutional guarantee against gen-

---

4. To like effect see *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 332, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

5. § 494.020, RSMo Supp.1975, describes many excluded classes, some of which are: those unable to understand the English language;

persons on active duty with the Armed Forces of the United States; licensed attorneys; judges of courts of record; persons suffering mental or physical illness or infirmity rendering them incapable of performing the duties of a juror.

der based disqualification is a far cry from equal protection cases cited by defendant, for example, the stigmatized blacks of Georgia whose more than 24 year exclusion from jury service was condemned in *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), and which led to adoption of the "rule of exclusion" in race discrimination cases. Nor does our system discriminate against either sex in the manner the rights of Mexican-Americans to serve on juries were denied by the jury commissioners' conduct in *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Neither do we have the highly subjective key man jury commissioner scheme of *Hernandez*, described as "susceptible to abuse" and "purposeful discrimination" in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), nor the non-random culling process by which class designations were emphasized in *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). *Castaneda*, not decided when this case was argued, and *Alexander*, not cited by defendant, are illustrative of the elements and problems of proof in equal protection based jury challenges. Finally, our jury selection process is quite dissimilar from the peculiar, "racially" controlled multi-layered Georgia system for school board and jury selection criticized in *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

The suspect practices condemned in those cases as denying equal protection because of invidious discrimination are neither condoned nor permissible in the jury selection system of Jackson County. The right of each class (men or women) to serve is equal. While members of either class may for cause shown, request and be granted exemption, in the case of women excuse from duty is more easily obtained, as a bare request suffices. However, the case confronting the Court in *Taylor* was one in which women as a class were denied such right to serve, absent affirmative action not required of men. For women in Louisiana, jury selection had been aptly described as a "volunteer" system, limited to those who filed declarations and asked to be included

in the list. The Court however, recognizing the absence of susceptibility to abuse or purposeful discrimination in the system common to the "equal protection" cases cited above, based its determination not on equal protection considerations but instead on Sixth Amendment provisions for jury trial as that amendment binds the states under the due process clause of the Fourteenth Amendment. See *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

The cited Missouri statute, § 494.031, RSMo Supp.1975, and Art. I, § 22(b) of the Constitution are not within the ambit of *Taylor* for two reasons. *First*: The Louisiana scheme impaired the *right* of the affected class. On the other hand, the *right* of Missouri women to jury service remains inviolate though they enjoy an expanded privilege to seek exemption and both sexes are automatically included in wheel and panels unless affirmative action is taken to be excused. In short, ours is not the automatic gender exclusion invalidated by *Taylor*, thus the presumption of constitutionality attaching to state procedures has force here. *Second*: Equally important to the outcome of this case is the fact that the *results* of Louisiana's jury selection scheme contrast sharply with those of the selection process in this case. Before comparing the *results* of the two systems, we must first examine the mechanics of the Jackson County process from the proof appearing in the record.

Defendant submitted 1970 Jackson County census figures reflecting approximately 407,000 county inhabitants over 21 years of age, with 54% (221,000) women and 46% (185,000) men, urging that we assume this gender distribution adhered among those eligible for Jackson County jury duty in 1976. A number of evidentiary gaps appear. Nothing is shown demonstrating a static gender distribution of Jackson County population from 1970 to 1976, and the Jackson County annual jury selection process begins with current voter registration lists, not 1970 census figures. Thus the gross population and percentage figures of-

fered by defendant appear patently overinclusive for the purpose here. This overinclusiveness is in part demonstrated by the following: No proof was offered that the sexes registered to vote in direct relation to their numbers; also, those 18 years and older are eligible to register which further distinguishes the 1976 voter registration lists from the 1970 (21 years and older) census figures defendant asks us to consider; in addition, the fluidity of voter registration lists reflects the constantly changing population patterns, and it was argued by respondent that percentage-wise more men normally register than women. All of this suggests that statistics of current "eligible population" referred to in *Alexander v. Louisiana, supra*, not 6 year old gross population figures, provide the proper starting point.

Though defendant seems to have fallen short in his burden of establishing constitutional invalidity, assuming arguendo that 54% of the 1976 voter registration lists (as in the 1970 census gross population figures) were female and assuming that all on the lists were eligible jurors, the 1976 Jackson County jury selection process was as follows: (1) By questionnaires, jury commissioners randomly canvassed 70,000 names of the county voter registration lists. The questionnaires notified those canvassed of women's privilege to elect not to serve. (2) From returned questionnaires, the 1976 wheel or master jury list was compiled containing 30,000 names of men and women apparently qualified for jury duty; however, no information was adduced of the wheel's gender distribution except an unverified pencil note on Exhibit # 5 (the computer print-out of the wheel) showing 29.1% women. (3) From the wheel, jury panels were summoned on a random basis each week and those summoned were notified of the female option to decline service. (4) For the periods June through October, 1975 and January through March, 1976, approximately 11,197 persons were summoned for jury duty and of that number 2,992 or 26.7% were women. (5) Of those summoned, 5,119 persons appeared and of that number 741 or 14.5% were women.

In March, 1976 (the time of trial), 1,537 were summoned for jury duty and of that number 453 or 29.5% were women and of 707 appearing 110 or 15.5% were women.[6] These figures reflect a dramatically higher percentage of female representation in wheel and panels than that condemned in *Taylor*. There, only 10% of the wheel was female and 1,800 persons drawn in St. Tammany Parish during the relevant $10\frac{1}{2}$ month period (4 months prior and $6\frac{1}{2}$ months after the trial), only 12 (less than 1%) were female and we are not informed if any of them appeared during the entire $10\frac{1}{2}$ months. This stands in marked contrast to the fact that during the month of defendant's trial, 29.5% of all venires summoned in Jackson County and 15.5% of those appearing for trial were female.

We are not told the number of women requesting exemptions but we do know that women originally canvassed who failed to return the questionnaire were automatically deemed eligible and included in the wheel. Those who claimed exemption could do so for a wide array of reasons other than the fact of their sex. For example, school teachers and government workers, whose jobs typically attract substantial numbers of women, may decline to serve under RSMo Supp.1975, § 494.031(5) and (7) respectively. We know from *Taylor*, 419 U.S. at 535 n. 17, 95 S.Ct. 692 that Department of Labor statistics indicate that in October of 1974, 54.5% of all women between 18 and 64 years of age were in the labor force. Additionally, 61% of persons over 65 are women who may have declined to serve only for reasons of age under § 494.031(1), RSMo Supp.1975, which inferentially reduces the ranks of eligible female jurors whom defendant insists opted off for reasons of sex. Regardless of these matters highlighting defendant's evidentiary shortcomings, which reasonably would diminish the percentage of females who might have sought sex-based exemptions, the number of female names in the wheel, those sum-

6. The panel of 53 in this case included 5 (9.4%) women, and the final 12 were male.

moned and those appearing were well above acceptable constitutional standards.[7]

The impediment of the Louisiana female "volunteer" or automatic exclusion system, was coupled with statistics showing sufficient sex disparity to work reversal. However, the Louisiana system did not contain the opportunity for subjective selection or discriminatory conduct by those in control of the system as in the previously cited equal protection cases, and the process was invalidated only on a strong showing that criminal jury venires were "almost totally male". Accordingly, we cannot say the jury selection process in Missouri and the resulting venires were violative of that standard enunciated in *Taylor*.

We hold the challenged Missouri constitutional provision and implementing statute are a part of a facially valid jury selection system and the product of that system did not deny defendant's right to due process of law under the Fourteenth Amendment as that principle embodies fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions.

■ Defendant next challenges the system and its results as violative of the Fourteenth Amendment and makes an ambiguous argument referring to the "methodology approved in *Hernandez v. Texas*," *supra*. *Hernandez* was a case turning on denial of "equal protection" and from this we assume defendant is directing his argument to that clause of the Fourteenth Amendment.[8]

---

7. Citing *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), decided on equal protection grounds, defendant urges that error in the trial court's failure to quash the jury panel appears from the statistics alone, but neither *Turner* nor subsequent cases support this position. See *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

*Turner* was a civil case brought by Negro residents involving Georgia's peculiar system of selecting the Taliaferro County Board of Education. The scheme provided for a County Board of five freeholders selected by the grand jury, which in turn was drawn from a jury list selected by the six county jury commissioners who were appointed by the State Superior Court Judge for the circuit in which the county was located. Statistical evidence showed 60% of Taliaferro County residents were Negro against 37% Negro representation in the questioned lists from which the grand jury was chosen. At every layer of the selection system white citizens were in total control, though all students in the county schools were Negro.

The trial court found that until suit was instituted "Negroes had been systematically excluded from grand juries through token inclusion". Against this background of pervasive discrimination the Court determined that a newly drawn grand jury list with 37% Negro representation, though of less racial disparity than previous lists, was nevertheless the product of continued purposeful discrimination. The prior list of 130, withdrawn after suit was filed, had contained only 11 Negro names. While the selection scheme was not found facially unconstitutional, the opportunity for discrimination was present. A number of citizens were declared unqualified by the white commissioners for lack of "intelligence" or "uprightness" and 178 persons (of whom 171 were Negroes) were so stricken.

From these and related facts, the Court concluded appellant made a prima facie case of purposeful discrimination. The disparity occurred at the point where subjective standards were applied setting the stage for the finding of pervasive discrimination which when coupled with statistical showing of underrepresentation led to reversal. Such purposeful or pervasive discrimination, neither suggested nor shown here, distinguishes the case at bar from *Turner* and renders the percentage of Negro participation in Georgia inapplicable here. In the disparity cases, as distinguished from those involving exclusion [e. g., *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942)] the Court typically has held a prima facie case is not made on the basis of statistics alone. In such cases, we find not only substantial disparity between the numbers of the eligible class and those included in the list, but also the opportunity in the selection procedures for discriminatory conduct calculated to produce the underrepresentation.

8. A question arises concerning this male defendant's standing to raise an "equal protection" claim against the alleged exclusion of women from his jury. It was settled in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), that such claims when couched in the Sixth Amendment and Fourteenth Amendment due process terms, may be made by one not a member of the excluded class. However, a male defendant's standing to challenge alleged exclusion of female jurors as a denial of Fourteenth Amendment equal protection rights was not decided by *Taylor*. A male defendant's standing to raise that issue is at best tenuous. In *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), a white defendant challenged his conviction on due process *and* equal protection grounds stem-

In *Hernandez*, a Mexican-American and a member of the prejudiced class proved that for 25 years no person of Mexican or Latin American descent had served on grand or petit juries or as jury commissioners in Jackson County, Texas, though 14% of the county population were of this class and it was stipulated that at least "some" had the legal prerequisites for such service. The Court invoked the "rule of exclusion" articulated in *Norris, supra,* because of the clear proof of long term class exclusion from jury service. From the 25 year exclusion and the systems' inherent opportunity for subjective discrimination, a presumption of equal protection denial arose, not rebutted by the jury commissioners' general assertion that they sought to select "those whom they thought were best qualified" [347 U.S. 1. c. 481, 74 S.Ct. 1. c. 672]. The Court stated, "[I]t taxes our credulity to say that mere chance resulted in there being no members of this class among the over six thousand jurors called in the past 25 years" [l. c. 482, 74 S.Ct. 1. c. 672]. Though the Texas selection system was "fair on its face" it was "susceptible to abuse" and being "employed in a discriminatory manner" [l. c. 478–79, 74 S.Ct. 667]. This, plus a history of total exclusion, gave rise to the unsuccessfully rebutted presumption.

No such exclusion or subjective discriminatory treatment at the hands of jury commissioners occurred in the case at bar. The names in both wheel and panels were picked at random from the registered voter lists. Women were not excluded nor (as heretofore discussed) were their *rights* to jury service diminished. Neither was the freedom of men to this cherished *right to serve* reduced or diluted in any way. The *rights* of each class were and are equal. While it might be argued the *duty* of men to serve is increased if women elect to opt off, men as a class may not reasonably be heard to complain that an added opportunity to participate in the system, which increases a cherished long-sought right, effects an equal protection denial for their class rising to a constitutionally impermissible level. Similarly, women may not be heard to claim a violation of equal protection when, while enjoying full rights to serve, by their free choice elect for a variety of reasons not to serve. This is privilege declined, not right diminished.

The question then becomes, whose rights are constitutionally affected? Since neither men nor women as a class may make a valid denial of equal protection claim, from the defendant's point of view this is not a problem best defined as one of "equal protection". Instead, as in *Taylor*, the question for the individual defendant is set in terms of his rights to a jury representative of the community under the Sixth Amendment made applicable to state procedure by the due process clause of the Fourteenth Amendment. We have previously discussed defendant's contention in that context and determined there has been no denial of such right. Defendant's first assignment of error is denied.

ming from the systematic exclusion of Negroes from the grand jury that indicted and the petit jury that convicted him. The Court noted that the question of standing for one not of the excluded class had never before been decided by the Court and that a number of state and lower federal courts had imposed a "same class" rule on challenges to discriminatory jury selection holding that the exclusion of a class from jury service is subject to challenge only by a member of the excluded class. However, the Court in *Peters* upheld defendant's standing to challenge the validity of the exclusion, when that challenge bottomed on a claimed denial of "due process of law" [l. c. 504, 92 S.Ct. 2163]. Thus while we may say with certainty male defendants have standing to raise Sixth Amendment jury questions and Fourteenth Amendment due process claims in cases where females are systematically excluded from the venire, standing of male defendants to raise "denial of equal protection" issues in such cases has not been decided and we find no binding authority for such proceedings. To the contrary, the Court has held "there is nothing in past adjudications suggesting that petitioner himself [a male] has been denied equal protection by the alleged exclusion of women from grand jury service." *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972).

## THE JOINDER AND SEVERANCE ISSUES

Defendant next contends the court erred permitting joinder of two charges against him in a single indictment and compounded the error by denying his motion for severance, thereby forcing him to defend both counts in the same trial.

■■■■ The charges of murder in the first degree for killing Riley, and assault with intent to kill for shooting Kinnison were part of the same transaction, the attempted robbery. Joinder of the charges as separate counts of the indictment is expressly permitted by Rule 24.04, as amended in 1971.[9] See *State v. Baker*, 524 S.W.2d 122 (Mo. banc 1975). The shootings occurred at the same place, in close succession and in connection with defendant's scheme to rob. Though each was a separate criminal offense, both were parts of the same transaction and by stating them in separate counts the state cannot be said to have attempted splitting a single crime to prosecute it in separate parts. This court made clear in *Baker* that a criminal defendant has neither a federal nor a state constitutional right to be tried on only one offense at a time. Referring to Rule 8(a) of the Federal Rules of Criminal Procedure of similar effect as our Rule 24.04, the court at page 126 stated: "This rule has been described as constituting essentially a restatement of statutory and familiar law and as not violating due process of law." In that case, involving a three count information, defendant requested the counts be tried together, effectively waiving any objection to the single trial of multiple charges but on appeal defendant contended such procedure was constitutionally impermissible. Rejecting this contention for reasons other than the apparent waiver, the court held that joinder of charges and trial of the separate offenses in a single proceeding was properly permitted.

■■■ Defendant invites us to find that the 1971 amendment to Rule 24.04 affects substantive rights and thus was promulgated in violation of Art. V, § 5 of the Missouri Constitution [10] rendering the joinder of counts and failure to sever erroneous and asks us to order reversal of the convictions. We decline the invitation for reasons stated in *Baker, supra* at 127:

> "Rule 24.04 is a *procedural* rule. It, like Rule 8(a) of the Federal Rules of Criminal Procedure, merely permits joining in one information or indictment certain related multiple offenses which otherwise would have been charged separately. It does not mandate any difference in treatment between those charged jointly and those charged in separate informations or indictments. It makes no provision with respect to the amount of punishment to be imposed or whether sentences shall be concurrent or consecutive." (Emphasis added.)

It may no longer be questioned that in a proper case offenses joined in a single indictment or information may be tried together. See *State v. Morgan*, 539 S.W.2d 660 (Mo.App.1976), for a discussion of the rationale of *Baker* as it relates to *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and the Fifth Amendment guarantee against double jeopardy. The Supreme Court of Arizona in *State v. Pierce*, 59 Ariz. 411, 129 P.2d 916 (1942), considered an attack on its rule authorizing joinder of different offenses under separate counts, charging it was violative of a defendant's substantive right in a criminal proceeding. The court rejecting this con-

---

9. Rule 24.04, effective July 1, 1971, provides in pertinent part: "All offenses which are based on the same act or on two or more acts which are part of the same transaction or on two or more acts or transactions which constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts, or in the same count when authorized by statute."

10. Mo.Const. Art. V, § 5—"The supreme court may establish rules of practice and procedures for all courts. The rules shall not change substantive rights, or the law relating to evidence, the oral examination of witnesses, juries, the right of trial by jury, or the right of appeal. . . ."

The 1976 revision to this article does not affect the issue here.

tention commented that defendant had not suggested any manner wherein the rule violated any substantive right and concluded "and we can think of none. The *method* of trial of a defendant in a criminal case, as in a civil, is procedural and not substantive . . ." [l. c. 917].

The remaining question concerns denial of defendant's motion for severance. Defendant bases his contention on the single argument that current Rule 24.04 is void; and from this he concludes the joinder was error, requiring severance. As noted above, the joinder was proper and defendant's major premise in this argument fails.

■ Further, severance is a matter within the sound discretion of the trial court directed toward achieving a fair determination of the defendant's guilt or innocence of each offense charged. The court should consider, among other relevant factors, the number of offenses charged, the complexity of the evidence to be offered and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense. The court remains under a continuing duty during trial to counter prejudice and order severance if necessary to achieve the fair result intended. Defendant has neither suggested nor has our examination of the record disclosed any abuse of discretion in denial of the requested motion for severance. This contention of error is denied.

The judgment of the trial court is affirmed.

MORGAN, C. J., and HENLEY and FINCH, JJ., concur.

DONNELLY, J., concurs in result.

BARDGETT, J., dissents in part and concurs in part in separate opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, Judge (concurring in part and dissenting in part).

I concur in that part of the principal opinion dealing with the jury selection issue. I dissent from that part of the opinion styled, "THE JOINDER AND SEVERANCE ISSUES", in which the court holds that Rule 24.04, in authorizing joint trial of separate offenses over a defendant's objection, is a constitutionally proper exercise of this court's rulemaking power under art. V, sec. 5, Mo.Const., as amended, and that a defendant is not entitled to a severance as a matter of right.

The right to be tried for separate offenses is, in Missouri, a substantive right which is subject to change only by statute, *State v. Terry*, 325 S.W.2d 1, 4 (Mo.1959), and not by court rule. My reasons for so concluding have been set forth in my dissenting opinion in *State v. Neal*, 514 S.W.2d 544 (Mo. banc 1974), and my concurring opinion in *State v. Baker*, 524 S.W.2d 122 (Mo. banc 1975).

In addition to the reasons stated in my separate opinions in *Neal* and *Baker*, the reasoning of Henley, J., and the court's holdings in *State v. Bursby*, 395 S.W.2d 155 (Mo.1965), support the conclusion that a right to a severance of counts alleging separate crimes is a substantive matter in Missouri.

In *Bursby*, the defendants (Bursby brothers) were charged in one information with three counts as follows: count 1—burglary of the Terry Town Store building owned by Lonus Speight and stealing therefrom; count 2—burglary on the same date of a tin grainery owned by Speight, located near the Terry Town Store, and stealing therefrom; and count 3—stealing of Speight's cement mixer located near the store building. The defendants, without counsel and upon waiving counsel, entered a plea of guilty to the information after being told by the judge they were charged with "a felony"; that they were entitled to a jury trial and counsel, etc. The court sentenced them to a term of four years on each of the three counts, the sentences to run consecutively. The Bursby brothers thereafter filed a 27.26 motion which was denied without hearing and the appeal came to this court.

This court granted relief holding that a person could be tried and convicted of only one felony at a time. The court said at 157–158:

"The offenses of burglary, and stealing in connection with such burglary, although separate and distinct crimes, may be joined in one information, and an accused may be tried and convicted of both offenses in one trial only because the rule and statute authorize and permit such as an exception to the general rule; the general rule being that an accused may not be charged, tried and convicted at the same time of two separate and distinct offenses. *State v. Preslar*, 316 Mo. 144, 290 S.W. 142 and cases there cited; *State v. Terry*, Mo., 325 S.W.2d 1, 4[3], and cases there cited."

And, quoting from *State v. Preslar*, 316 Mo. 144, 290 S.W. 142, 143–144, *Bursby* further stated at 158–159:

" * * * In justice to all parties concerned, we think the matter should be disposed of as though counsel for appellant made no request of the court to require the prosecuting attorney to elect upon which of the four counts he would proceed, until the filing of the motion for a new trial, as aforesaid. On the other hand, the [trial] court ruled it was not required to order an election under the laws of this state. We hold that, under the rulings of this court, the question of election is not a mere matter of form, which may be waived, as claimed by the state, supra, but it involves a question of jurisdiction and power. This principle of law was announced with great clearness and force by Judge Gantt in the leading case of *State v. Carragin*, 210 Mo. [351] loc. cit. 371, 109 S.W. [553] 558, (16 L.R.A. [N.S.] 561) where he said: 'In instructing the jury that they might find the defendant guilty under both counts, and in refusing to require the prosecuting attorney to elect after all the evidence was in, the court committed reversible error. We know of no case under our practice in which an accused may be tried and convicted of two distinct felonies except in the case of burglary and larceny, which is expressly allowed by statute.'

"The law, as above written is fully sustained by other decisions of this court, as follows: *State v. Guye*, 299 Mo. [348] loc. cit. 366, 252 S.W. 955; *State v. Link* [315 Mo. 192], 286 S.W. 12 et seq.

"We have no hesitation in holding that, on the record before us, the judgment of conviction in which defendant has been sentenced to the penitentiary for 8 years on four separate and distinct felonies, set out in four separate counts of the information, cannot stand the test of judicial criticism, under the laws of this state. We are of the opinion that it was the absolute duty of the trial court in this case, whether requested or not, to have directed the prosecuting attorney, before submitting the case to the jury, to elect on which of the four counts in the information he would proceed to trial and to strike out the remainder. In addition to foregoing, as a part of the state's case, whether requested or not, it was the imperative duty of the court to instruct the jury that they could not find the defendant guilty except on the single count submitted for their consideration. *State v. Burrell*, 298 Mo. [672] loc. cit. 678, 679, 252 S.W. 709, and cases cited."

Art. V, sec. 5, Mo.Const., says that the rules of practice and procedure "shall not change substantive rights." The principal opinion follows the observation of Finch, J., in *Baker, supra*, to the effect that Rule 24.04 is a rule of procedure. That observation is sound, in my judgment, and one with which I do not disagree, but it is not dispositive of the issue which the constitution puts to us. The point is that Rule 24.04 is a rule of procedure which *changes* the substantive right of criminal defendants to have separate trials for separate offenses, a right which was the practice of our courts to honor prior to the promulgation of the rule.

What is a "substantive" right? Former Governor Guy B. Park, who introduced the amendment which later became art. V, sec. 5, *at the 1943–44 Constitutional Convention*, described substantive rights as "the rights

guaranteed by the Constitution of this state and of the nation. The rights that have been established by custom and by common law—they shall not be abridged, enlarged nor modified." XIII Debates of the Missouri Constitution 1945 at 3824.

The Convention considered an amendment to that which became sec. 5 which would have granted unlimited power to the Supreme Court to promulgate rules of practice and procedure. Delegate Garten, speaking as one "unreservedly opposed to this amendment", suggested that it was "too great a delegation of power" which fails to "give the Legislature the power to annul or amend *some rule which may endanger private rights.*" XIII Debates of the Missouri Constitution 1945 at 3875. (Emphasis added.) The amendment was defeated by a voice vote.

In *Maurizi v. Western Coal & Mining Co.,* 321 Mo. 378, 11 S.W.2d 268 (banc 1928), we described as substantive law " 'that part of the law which creates, defines and regulates rights as opposed to adjective or remedial law, which prescribes the method of enforcing rights or obtaining redress for their invasion.' " *Id.* at 272. See also *Shepherd v. Consumers Cooperative Association,* 384 S.W.2d 635, 640 (Mo.banc 1964); *Barker v. St. Louis County,* 340 Mo. 986, 104 S.W.2d 371, 377–378 (1937); *Ambrose v. State Department of Public Health & Welfare,* 319 S.W.2d 271, 274 (Mo.App.1958); *Poyser v. Minors,* 7 Q.B.D. 329, 333 (1881).

Was the general rule prior to our adoption of Rule 24.04, as enunciated in *Bursby, supra,* a rule of "substantive" dimension? I believe the answer to be yes.

In seeking to understand the origin of our general rule prior to 24.04, it has been necessary to examine the foundation for the decisions wherein the old rule was reaffirmed. *Bursby* relies on *State v. Terry, supra,* and *State v. Preslar, supra,* which rely on *State v. Carragin,* 210 Mo. 351, 109 S.W. 553 (1908), which relies on *Mayo v.*

*State,* 30 Ala. 32, 33 (1857), and *Mayo* relies on *State v. Nelson,* 8 N.H. 163, 165 (1835), which states: "[N]o court ever permits a prisoner to be tried for two distinct and separate crimes upon one indictment; because by such a course he might be confounded in his defence, and the minds of the jurors distracted."

*Nelson* finally relies upon *Young v. The King,* 3 D. & E. 98 (K.B.1789), which says at 106 per Buller, J., that the rule exists "lest it should confound the prisoner in his defence, or prejudice him in his challenge of the jury; for he might object to a juryman's trying one of the offences, though he might have no reason to do so in the other. . . . I thought it the soundest way of administering justice . . . in order to give a prisoner a fair trial."

What our Rule 24.04 changed was a rule which existed "in order to give a prisoner a fair trial." I cannot imagine a rule of greater substantive import. It is not relevant that Rule 24.04 can be described as procedural. After all, "[t]he history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York,* 324 U.S. 401, 414, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (Frankfurter, J.). A procedural rule can affect and change substantive rights. In my judgment, our Rule 24.04 does so, and is thus beyond our constitutional authority.

In my opinion, it was error to deny defendant's motion for severance. It should have been granted. See concurring opinion of Donnelly, J., in *Neal, supra,* at 550.

SEILER, Judge (dissenting).

I join in the dissent of Bardgett, J., on the question of our lack of authority to promulgate rule 24.04 for the reason that it is a procedural rule which changes substantive rights and dissent further on the question of whether our provision permitting women to exempt themselves from petit jury services, Art. I, § 22(b), Mo.Const.[1] and

1. The constitutional exemption for women was the subject of extended debate at the Constitutional Convention, VI Debates of the Missouri Constitutional Convention 1788–1814 (1943–

44). A motion to remove the exemption lost 31–32, with the chair casting the deciding vote. Id. at 1814. One of the principal objections voiced by those who would remove the exemp-

§ 494.031(2) RSMo Supp.1975, survives the challenge of *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) and the equal protection clause of the United States Constitution. I believe it does not and that the judgment of conviction should be reversed and the cause remanded for this reason also.

The principal opinion is in error, in my judgment, in proceeding on the premise of an alleged "right of Missouri women to jury service" which "remains inviolate though they enjoy an expanded privilege to seek exemption . . . ." No such "right to serve" exists. Many qualified citizens will never sit on a jury. No one has a right to insist that he or she, in particular, be summoned for jury service or serve on a jury.

Rather, a criminal defendant's right to a trial by jury, applicable to the states under the due process clause of the Fourteenth Amendment, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), includes the right to "a fair possibility for obtaining a representative cross-section of the community." *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970). To this right is attached a correlative duty on the part of those citizens called to serve, see *Hohfeld,* Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 30–32 (1913). Jury service, in short, "is not a right or privilege which may be claimed, but is an obligation imposed by law upon those who come within a designated class possessing the required qualifications." 47 Am.Jur.2d *Jury* § 90 (1969).

The principal opinion denies the alleged unconstitutionality under *Taylor* of our scheme for the voluntary exemption of women from jury duty for two reasons. One is that "the right of Missouri women to jury service remains inviolate." As I have noted, no such "right" exists. The fact that the *duty* remains inviolate is not dispositive: the duty of women to serve remained inviolate under the Louisiana system, which was nonetheless found unconstitutional in

*Taylor.* The second reason is that "the results of Louisiana's jury selection scheme [held unconstitutional in *Taylor*] contrast sharply with those of the selection process in this case."

The principal opinion observes that the fact that only 14.5–15.5 percent of the jury panels in the relevant period in Jackson County were made up of women (1) represents "a dramatically higher percentage of female representation . . . than that condemned in *Taylor*" where less than one percent of the jury panels during the relevant period were made up of women, and (2) is nevertheless explainable "for a wide array of reasons other than the fact of their sex", such as, for example, the exemptions permitted of school teachers and government workers "whose jobs typically attract substantial numbers of women" or that permitted to persons over age 65, 61 percent of whom are women.

The rule in *Taylor* is that "it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequences is that criminal jury venires are almost totally male." 419 U.S. at 537, 95 S.Ct. at 701. It is not necessary to show a governmental intent to discriminate against women, but only to evaluate the "systematic impact" of our system upon defendants' rights. *Taylor v. Louisiana, supra* at 525, 95 S.Ct. 692. The findings before us show that 85 percent of the relevant jury panels in Jackson County were male. No excuse, whether derived from the observations of this court of the role of women in our society or from a percentage comparison of the Louisiana and Missouri systems, can overcome the end result of our gender based exemption. Eighty-five percent or approximately six men to one woman is, to me, "almost totally male." I simply cannot understand it to be otherwise. The *Taylor* case does not say that anything more than one percent women is constitutional. The situation in Jackson County is not as bad as it was in St. Tammany Parish, but it does not have to be

---

tion was that if women were permitted to avoid jury duty by self-exemption, the objective of a

representative cross-sectional jury would not be realized.

in order to fit the description "almost totally male."

In Jackson County, Missouri, the right of the women to exemption is given considerable prominence, first in the Official Notice and Questionnaire and next in the summons for jury service. In each she is invited to excuse herself. "[O]nce a woman was informed of her right to automatic exemption, the likelihood that she would be a willing participant in the administration of justice declined markedly." Comment, 41 Mo.L.Rev. 446, 454 (1976). See *People v. Moss,* 80 Misc.2d 633, 366 N.Y.S.2d 522 (Sup. Ct.1975).

In the case before us and in the four other cases which were argued along with it, involving five criminal trials in Jackson County, between April 1975 and March 1976, using the jury selection system outlined in the principal opinion, the record showed that a maximum of 15 percent of any jury panel were women.[2]

Contrast this with the federal court in the Western Division[3] of the Western District of Missouri, where the court has no automatic exemption for women, 28 U.S.C. §§ 1861, et seq. (1970), 1968 Federal Jury Selection and Service Act. There, according to recent statistics, 53 percent of the persons on the master wheel and 39.8 percent of the actual jurors were women, J. Van Dyke, Jury Selection Procedures: Our Uncertain Commitments to Representative Panels 357 (1977). Yet aside from the unlimited self-exemption provision for women,[4] there is no significant difference between the two court systems as to groups or occupational classes which are excused from jury service.

"In a complex society such as ours, a jury that is the true 'conscience of the community' must include a fair cross-section of the groups that make up the community. Each person comes to the jury box as an individual, not as a representative of an ethnic, racial, or age group. But since people's outlooks and experiences do depend in part upon such factors as socioeconomic status, ethnic background, sex, or age, to ignore such differences is to deny the diversity in society as well as the fundamental character of the 'community' whose voice is to be heard in the jury room. So, although each juror's individuality must be respected (in fact, the system counts on jurors trying to overcome their prejudices to judge a case on its own merits), the juror's identification with certain demographic groups must be respected." J. Van Dyke, supra at xiv.

The principal opinion, finally, deals briefly with appellant's claim under the equal protection clause of the Fourteenth Amendment. The problem of defendant's standing to raise the equal protection claims of himself or of third party males who would allege a disproportionate burden in violation of their equal protection guarantees, is indeed a serious one. Under current United States Supreme Court doctrine it is speculative as to how such a standing question might be resolved, granting that the principle of a representative jury is a requirement of equal protection, *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). See *Craig v. Boren,* 429 U.S. 190, 193–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Peters v. Kiff,* 407 U.S. 493, 496, n. 4, 92

---

2. The other four cases were as follows: In *State v. Harlin,* Mo., 556 S.W.2d 42, of the persons summoned and who appeared as prospective jurors during the week of defendant's trial, only 9.2 percent were women. In *State v. Davis,* Mo., 556 S.W.2d 45, it was 15 percent women. In *State v. Lee,* Mo., 556 S.W.2d 25, it does not appear how many of the 300 summoned appeared, but on the panel of 90 for the defendant's case, only 10 percent were women. In *State v. Minor,* 556 S.W.2d 35, it does not appear how many jurors were summoned but of the 55 on the defendant's panel, only 10.9 percent were women.

3. The Western Division includes Jackson County and ten other counties. Two thirds of the population of the division is in Jackson County. See Population of Counties, Official Manual of State of Missouri, 1975–1976, Table 3, commencing at page 1217.

4. Instead, the federal court provides for excuse on request by a woman charged with care of minor children without adequate domestic help. Amended Plans of the United States District Court for the Western District of Missouri for Random Selection and Service of Grand and Petit Jurors § 14(i) (1972).

S.Ct. 2163, 33 L.Ed.2d 83 (1972) (opinion by Marshall, J.) (referring to the "same class" rule of some courts that the exclusion of a class from jury service is subject to challenge only by a member of the excluded class); Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L. Rev. 423 (1974).

We are not, however, bound by the justiciability doctrines of the federal system which derive from the Article III "case or controversy" requirement of the Constitution and the prudential concerns which the Supreme Court has applied as "matters of judicial self-governance." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); see Comment, 50 N.Y.U.L.Rev. 1163, 1171–73 (1975). Rather, we are obligated to apply our own standards of justiciability. Note, Protecting Fundamental Rights in State Courts: Fitting a State Peg to a Federal Hole, 12 Harv.C.R.–C.L.L.Rev. 63, 90–93 (1977).

I would hold that where "the exclusion of a discernible class from jury service injures not only those defendants of the excluded class, but other defendants as well, in that it destroys the possibility that the jury will reflect a representative cross-section of the community," *Peters v. Kiff, supra* 407 U.S. at 500, 92 S.Ct. at 2167 (opinion of Marshall, J.), that there exists in the instant case a sufficient nexus between the status of the claimant, his allegation, his legal interest, and his requested relief to permit his standing to assert a denial of the equal protection of the laws by our gender based exemption provision for jury duty. We have recently held that a primary objective of the standing doctrine is "to assure that there is a sufficient controversy between the parties [so] that the case will be adequately presented to the court . . . [for the] purpose of preventing parties from creating controversies in matters in which they are not involved and which do not directly affect them . . .." *Ryder v. County of St. Charles,* 552 S.W.2d 705, 707 (Mo.banc 1977). That objective has surely been met here.

I would then consider the substantive merits of the equal protection claim.

"To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren, supra,* 429 U.S. at 197, 97 S.Ct. at 457; see Johnston, Sex Discrimination and the Supreme Court—1971–1974, 49 N.Y.U.L.Rev. 617 (1974). Under that rule, I can find no valid justification for our gender based scheme, and would therefore hold that it denies defendant equal protection. See Note, *Taylor v. Louisiana* : Constitutional Implications for Missouri's Jury Exemption Provisions, 20 St. Louis U.L.J. 159 (1975); Comment, 41 Mo.L.Rev., supra.