**STATE of Missouri, Respondent,**

v.

**Vincent X. LEE, Appellant.**

No. 59607.

Supreme Court of Missouri, en banc.

Sept. 27, 1977.

Rehearing Denied Oct. 11, 1977.

Lee M. Nation, Kansas City, for appellant.

Nanette K. Laughrey, Asst. Atty. Gen., Jefferson City, for respondent.

**28** ■■■■■■■■■■■■■■■■■■■■■■■■

RENDLEN, Judge.

■ Charged by indictment with two counts of robbery first degree with a deadly and dangerous weapon and two counts of murder first degree, defendant was convicted on each count and sentenced to four terms of life imprisonment.[1] Defendant appealed to the Missouri Court of Appeals, Kansas City district, and raised questions of constitutional construction falling within the exclusive appellate jurisdiction of the Supreme Court under Mo.Const. Art. V, § 3, as amended in 1970. Accordingly the cause was transferred here prior to opinion.

Five assignments of error are presented: (1) Failure to quash the jury panel because Missouri's jury selection process systematically excludes women; (2) Erroneous joinder and refusal to sever four felony charges; (3) Wrongful denial of defendant's motion for change of venue as pretrial publicity prevented him from receiving a fair trial in Jackson County; (4) Improper limitation of defendant's direct examination of an alibi witness; and (5) Insufficiency of the evidence to support the verdicts. We affirm.

The convictions arose from occurrences on the afternoon of June 15, 1975, in the "7–11" Store at 23rd Street and Noland Road in Independence, Missouri. Defendant was seen in the store about 2:00 p.m. and soon thereafter was observed driving from the parking lot at a high rate of speed. Within a few minutes two murder victims were found in the store, one a female employee and the other a male, apparently a customer. Abundant evidence linked defendant with the murders and robbery of the store. The evidence also indicated defendant had robbed the dead male victim.

## THE JURY SELECTION ISSUE

■ Defendant contends the trial court erred in failing·to strike the jury because Missouri's jury selection process, Mo.Const. Art. I, § 22(b) and § 494.031(2), RSMo Supp. 1975,[2] systematically excludes women from jury service and is therefore unconstitutional, citing *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). *State v. Duren*, No. 59914, 556 S.W.2d 11 (Mo. banc 1977), decided concurrently with the case at bar, upheld the challenged constitutional section and its implementing statute which permit women the privilege of declining jury service and that decision is dispositive of this defendant's sex based challenge to the facial validity of the cited sections.

■ The remaining question is whether from the evidence it has been shown that the Jackson County jury selection process *resulted* in criminal venires not "representative of the community" and "almost totally male", as those constitutional standards were delineated in *Taylor*, requiring reversal in this case. Defendant submitted 1970 Jackson County census figures reflecting approximately 407,000 county inhabitants over 21 years of age with 54% (221,000) women and 46% (185,000) men, urging that we assume this gender distribution adhered among those eligible for Jackson County jury duty in 1975. A number of evidentiary gaps appear, essentially the same as those discussed at length in *Duren*, the companion case referred to above. However, assuming arguendo that 54% of the persons eligible for jury service in Jackson County in 1975 were female, the jury selection process in Jackson County and its results pertaining here were as follows: (1) By questionnaires, the jury commissioners randomly canvassed

---

1. The trial court refusal to state whether the sentences were to be served consecutively or concurrently. In such situations "an intention is thereby evinced that the sentence[s] should be served concurrently." *Forbes v. Haynes*, 465 S.W.2d 485, 491 (Mo. banc 1971); *Anthony v. Kaiser*, 350 Mo. 748, 169 S.W.2d 47 (1943).

2. The questioned constitutional section and statute are in pertinent part: Mo.Const. Art. I, § 22(b)—"No citizen shall be disqualified from

jury service because of sex, but the court shall excuse any woman who requests exemption therefrom before being sworn as a juror."
§ 494.031, RSMo Supp.1975—"The following persons shall, upon their timely application to the court, be excused from service as a juror, either grand or petit: . . . (2)Any woman who requests exemption before being sworn as a juror; . . . ."

70,000 names in the county voter registration lists, notifying those canvassed of inter alia, the female privilege not to serve; (2) From returned questionnaires, the 1975 wheel or master jury list was compiled containing approximately 30,000 names of men and women apparently qualified for jury duty; however, no information was adduced of the 1975 wheel's gender distribution;[3] (3) Jury panels were summoned from the wheel on a random basis each week and those summoned were notified of the female option to decline service; (4) During the months of June through October, 1975, approximately 7,186 persons were summoned for jury duty and of that number 1,873 or 26% were women; (5) Of those summoned, 3,197 appeared of whom 451 or 14% were women.

For the week of November 17, 1975 (the time of trial), 300 veniremen were summoned and of that number 88 or 29.3% were women. The panel of 90 in this case included 9 (10%) women but the final 12 were men. These figures reflect a significantly higher percentage of female representation in wheel and panel than those condemned in *Taylor*.

The statistical data of *Taylor* were examined at length in *Duren* and the discussion in that case is pertinent here. Under that analysis it is apparent the proof in the case at bar does not support the contention that the jury venire was the result of constitutionally impermissible systematic sex based exclusion. The first assignment of error is denied.

## THE JOINDER AND SEVERANCE ISSUE

■ Defendant next contends the court erred permitting joinder of four charges in a single indictment and compounded the error by denying the motion for severance, forcing him to defend all charges in a single trial. The killings of Pope and Mitchell were parts of the same transaction, i. e., the robberies involving money taken from the 7–11 Store and the wallet (and its contents) taken from Mr. Pope. Each act occurred at the same location, apparently in close succession and though they constituted separate criminal offenses, all were part of the same transaction. The state cannot be said to have added unconnected crimes or to have split a single crime for prosecution in separate parts. Joinder of the charges was permissible under Rule 24.04, as amended in 1971.[4] See *State v. Baker*, 524 S.W.2d 122 (Mo. banc 1975).

In *State v. Duren, supra*, this court considered a constitutional challenge to Rule 24.04, essentially the same as that made by this defendant. The ruling in that case is dispositive of the issue here and, as in *Duren*, defendant has neither suggested nor has our examination of the record disclosed any abuse of discretion in denial of the requested motion for severance.

## DENIAL OF CHANGE OF VENUE

■ It is contended the trial court erred in failing to grant a change of venue because the evidence showed that pretrial publicity of the crimes was so extensive defendant could not receive a fair trial in Jackson County. A criminal defendant is not entitled to a change of venue to another county merely because he alleges prejudice against him on the part of the inhabitants of the county in which the cause is pending.

3. Defendant as an appendix to his brief, submitted a tabulation of the responses to questionnaires for jury service. The information contained in the appendix was neither introduced in the trial proceedings nor made a part of the appellate record by stipulation or order of court under prescribed procedures for correcting and supplementing transcripts on appeal. See Rule 81.12. We do not consider matters so submitted. *State ex rel. State Highway Commission v. Galeener*, 402 S.W.2d 336, 342 (Mo.1966); *State ex rel. Freeze v. City of* *Cape Girardeau*, 523 S.W.2d 123 (Mo.App. 1975).

4. Rule 24.04, effective July 1, 1971, provides in part: "All offenses which are based on the same act or on two or more acts which are part of the same transaction or on two or more acts or transactions which constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts, or in the same count when authorized by statute."

He must, as provided in Rule 30.04, file an application setting forth the grounds on which the change is sought and the application "*shall*, except as hereinafter provided, be supported by the affidavit of the petitioner and *by the affidavits of at least two credible, disinterested citizens* of the county where the case is pending, and shall be proved to the satisfaction of the court by legal and competent evidence . . . ." (Emphasis added.) Thus he is required to file such affidavits of witnesses who attest to the pervasive bias against him. *State v. Barrington*, 198 Mo. 23, 95 S.W. 235 (1906); *State v. McGee*, 341 Mo. 148, 106 S.W.2d 478 (1937). Defendant's application for change of venue is not contained in the transcript nor do we find reference to or copies of supporting affidavits. Respondent's brief states defendant failed to file the required affidavits and we find nothing to contradict this assertion of fact. This deficiency warrants denial of the motion. *State v. Euge*, 349 S.W.2d 502 (Mo.App.1961).

Defendant however insists the change of venue should have been ordered notwithstanding the procedural defect. In *State v. Denmon*, 473 S.W.2d 741 (Mo.1971), the trial court had properly refused an application for change of venue because the provision of Rule 30.04 requiring supporting affidavits of five witnesses (for counties of less than 75,000) had not been met. The trial court's refusal to grant a change on grounds within his own knowledge was affirmed against defendant's claim of abuse of discretion. The Rule provides that if the facts alleged as grounds for change in the application are "within the knowledge of the court or judge, it or he may order such removal without requiring any formal proof or the filing of supporting affidavits. . . ." Seeking to avail himself of this provision, defendant argues that wholesale pretrial publicity of the crimes charged resulted in prejudice among inhabitants of the county. Extensive evidence of media coverage was introduced and at least two of the news articles referred to defendant's prior criminal record. Other references concerning defendant were not relevant to his guilt or innocence and the time lapse occurring between the dates of publication and trial ameliorated their impact. The latest public dissemination of information was June 19, 1975, while the change of venue hearing date was October 10, 1975, and the trial was held November 17 of that year. Moreover, the trial judge cautioned counsel that "if we are unable to select a panel using the care that we intend to, we may have to back up and make a different ruling on the change of venue", demonstrating a commendable concern for fairness in the conduct of the proceeding.

The bulk of the publicity had occurred within a very short period about four months prior to trial and the references to defendant's past criminal activity were limited. Approximately 43 of 70 prospective jurors indicated they had some knowledge that a robbery had occurred at the 7–11 Store and that murders were involved. Defendant in his brief asserts the 43 veniremen remembered the incident though they had been informed only that Vincent X. Lee had been charged with robbery and murder. However, the prosecutor had at that point informed them when and where the robbery had occurred, who was murdered, the manner of the killings and the fact that the case had been given wide publicity. It is not surprising that more than half of the panel remembered something of the incident.

Each of the 43 veniremen having prior knowledge of the matter was questioned by the court, by the state and by defense counsel in chambers. Those who remembered publicity of defendant's past criminal activity were excused, as were all who hinted they had formed an opinion based on pretrial publicity. Those who had only vague recollections about the incident or the nature of the crime were not excused for cause. The record warrants the trial judge's conclusion that the time lapse between the publicity and the trial was sufficient to insure a fair and impartial trial in Jackson County and shows the trial court excluded any who appeared other than fair and impartial. Of the final 12 selected for jury service, only 7 indicated they had even heard of the matter and though questioned

extensively in chambers they were not thereafter challenged for cause. Familiarity with some facts of a case without formation of an opinion as to guilt or innocence does not disqualify a juror. *State v. Spica*, 389 S.W.2d 35 (Mo.1965), *cert. denied*, 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312. See *Dobbert v. Florida*, —— U.S. ——, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

■ Appellant complains that during voir dire he could not as a matter of trial strategy ask the array if any had read of appellant's prior criminal record. However, he was able to inquire if they recalled anything of defendant's background, where he lived before coming to Missouri and similar information. In response to these questions some remembered reading of defendant's prior criminal activities but most indicated they remembered nothing of his background. It does not appear that appellant was in fact substantially hindered in his voir dire efforts to determine potential bias of prospective jurors. Rather it appears those not excused for cause either had no prior knowledge of defendant's criminal activity or had forgotten the details. The court determined the evidence insufficient to show defendant could not receive a fair trial in Jackson County and defendant failed to demonstrate the court abused its discretion in refusing to order a change of venue on its own motion. *State v. Coleman*, 460 S.W.2d 719 (Mo. banc 1970). See also *State v. Denmon*, *supra* at 746. The contention of error is denied.

### LIMITATION OF DEFENSE COUNSEL'S INTERROGATION OF ALIBI WITNESSES

Curtis Hudson testified that on June 15, 1975, he saw appellant for five to ten minutes in Leavenworth, Kansas, between 1:30 and 2:00 p. m. The half hour span he described was immediately before or during the period when the crimes were committed. After developing testimony of the relationship between the witness and Vincent X. Lee, defense counsel inquired if he had driven to court that morning from Leavenworth, Kansas. This led to the following:

"Q. Did you notice how long it took you to travel from Leavenworth to Kansas City?

MR. HAGGERTY: Wait just a moment. Object to the question, your Honor. It's totally irrelevant and not material to any issue before the Court how long it took him to come to court.

THE COURT: I'll sustain the objection.

MR. LARSON: May we approach the bench, your Honor?

(Counsel approached the bench and the following took place out of hearing of the jury.)

MR. LARSON: Your Honor, I think it's relevant to determine how long it took him to get from one place to another.

THE COURT: Not this particular individual. It would be completely immaterial as to how long it took him. It depends on the route that he took and the speed that he drove.

MR. LARSON: I think that's subject to cross-examination.

THE COURT: To set his conduct up as a standard that it takes so long to come from Leavenworth wouldn't be proper, I don't think. There are many roads to Leavenworth, for one thing.

MR. LARSON: We can't call in anybody whose ever driven to Leavenworth either. I think it's relevant to the issue.

THE COURT: I'll sustain the objection as to this man's personal experience.

(The proceedings returned to open court.)"

Defense counsel made no attempt to elicit further testimony in this area by rephrasing the question or laying a proper foundation.

■ Evidence, to be relevant, must logically tend to prove or disprove a fact in issue or to corroborate evidence which is relevant and bears on the principal issue.

*State v. Moore*, 435 S.W.2d 8 (Mo. banc 1968); *State v. Jenkins*, 516 S.W.2d 522 (Mo.App.1974); *State v. Bolden*, 525 S.W.2d 625 (Mo.App.1975). We find no error in the court's ruling. The propounded question was vulnerable to the objection and defense counsel's explanation did little to demonstrate how it might be proper. Questions of evidence relevancy are left to the discretion of the trial judge, *State v. Proctor*, 546 S.W.2d 544 (Mo.App.1977); *State v. Martin*, 530 S.W.2d 447 (Mo.App.1975); *State v. Evans*, 406 S.W.2d 612 (Mo.1966), and his ruling will be disturbed only if clear abuse of discretion is shown. *United States v. Cole*, 449 F.2d 194 (8th Cir. 1971), *cert. denied* 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806. There was no attempt to show that traffic conditions between Leavenworth and Kansas City on the morning of trial were similar to those between 1:30 to 2:00 p. m. of June 15, 1975, the date of the crime. It is likely that they were not. No attempt was made to compare the weather, road or other conditions affecting travel time on the morning of trial to those on the afternoon of the crime. There was no evidence of the available routes, their distances, speed limits, traffic control devices or similar information to establish a foundation for a meaningful comparison of travel times. Also the question as propounded related to the distance from Leavenworth to the Kansas City Courthouse which we take notice is more than 9 miles from the scene of the crime. *State v. Heissler*, 324 S.W.2d 714, 716[3] (Mo.1959); *State v. Garrett*, 416 S.W.2d 116, 118[1] (Mo.1967). This is not to suggest that proper questions and answers elicited on this point or results of a controlled experiment would not have been admissible. *State v. Baldwin*, 358 S.W.2d 18 (Mo.1962); *State v. Gish*, 371 S.W.2d 654 (Mo.App.1963). See also *People v. Dyer*, 11 Cal.2d 317, 79 P.2d 1071 (1938) and *Commonwealth v. Bonomi*, 335 Mass. 327, 140 N.E.2d 140 (1957), concerning testimony as to the time to travel distances by foot and by car in situations similar to that at bar. The point is without merit.

## SUFFICIENCY OF THE EVIDENCE

The final contention concerns sufficiency of the evidence to support the verdict and such an attack requires us to view the evidence most favorably to the state. All evidence tending to support the guilty verdict must be considered as true, contrary evidence disregarded and every reasonable inference supporting the verdict indulged. *State v. Reed*, 453 S.W.2d 946 (Mo.1970); *State v. Roberson*, 548 S.W.2d 280 (Mo.App.1977); *State v. Angel*, 520 S.W.2d 687 (Mo.App.1975). These principles apply whether the evidence is circumstantial or direct, *State v. Cobb*, 444 S.W.2d 408 (Mo.1969); *State v. Webb*, 527 S.W.2d 728 (Mo.App.1975). *State v. Parcel*, 546 S.W.2d 571, 573[2] (Mo.App.1977), citing *State v. Papin*, 386 S.W.2d 355, 359 (Mo. 1965). However, when a conviction is based solely on circumstantial evidence, the facts and circumstances relied on by the state to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence. *State v. Crow*, 486 S.W.2d 248 (Mo.1972); *State v. Burnley*, 480 S.W.2d 881 (Mo.1972); *State v. Potter*, 530 S.W.2d 268 (Mo.App.1975). In such cases the evidence need not be conclusive of guilt, nor must the evidence demonstrate the impossibility of innocence. *State v. Maxie*, 513 S.W.2d 338 (Mo.1974); *State v. Taylor*, 445 S.W.2d 282 (Mo.1969).

Substantial direct evidence placed defendant near and *in* the 7–11 Store moments before the crimes. Immediately after the crimes he was seen driving from the scene at a high rate of speed. No eye witness to the killings was available except the murderer because others in the store at the time were shot as they lay on the floor in the back room. There was ample testimony that defendant was driving his freshly painted black over yellow Cadillac on Noland Road in the immediate vicinity of the 7–11 Store at about 1:50 p. m. on the day of the murders [June 15, 1975]. Defendant was identified at the scene by four witnesses and three others in part corroborated this identification.

At approximately 2:00 p. m. David Geiter, on an errand to the "7-11" saw defendant's Cadillac on the parking lot, backed in by the door. It was the only car on the lot other than Geiter's. When he entered the store he noticed that defendant, who was wearing shiny green shoes, and a lady employee were the only persons there. Geiter left the store about 2:05 p. m.

Between 2:15 to 2:20 p. m. witness Mary Beckman saw defendant's car leaving the parking lot at a high rate of speed driven by a person strongly resembling defendant [another witness positively identified defendant as he drove from the area] and "her curiosity was aroused by the manner in which he [defendant] 'left the store'". On cross-examination Beckman stated she first saw the person strongly resembling defendant driving a black over yellow Cadillac as it was leaving the 7-11 parking lot, but did not see him *leave the store* and enter his car. But whatever she first noticed, her curiosity was aroused causing her to look inside the store and seeing no one, to enter. Finding the store empty, she went to the back room, discovered the murdered man and woman and promptly called the police. The identification of defendant at the scene immediately before and after the crimes is to be considered in determining the sufficiency of the evidence. *State v. Reed, supra; State v. Johnson*, 510 S.W.2d 485 (Mo.App.1974).

During the period between 2:05 and 2:15 to 2:20 the murdered man, Pope, apparently entered the store, either shortly before or during the robbery. It was stipulated that the store supervisor would testify "the loss of the store *in the robbery* on June 15, 1975, is $219.73". (Emphasis added.) The following day when the Cadillac was discovered and defendant arrested, he was wearing shiny green shoes of the type he had been observed wearing on June 15, at the "7-11". Several spots of blood (type unidentified) and a human hair matching that of the murdered woman, were discovered on defendant's shoe. When Judith Mitchell was lying on the floor, her hands were tangled in her hair, and freshly pulled hair was found among her fingers, twisted on her ring and near her head in the serum exuding from her mouth as she lay face down in the back room. Freshly pulled hair was found only in the room near her body and the hair discovered on defendant's shoe "exhibited a root that was forcibly removed from the scalp". As mentioned above, when compared microscopically with samples from the dead victim, the freshly pulled hair and the hair on defendant's shoe were found to be alike in all identifiable characteristics, strongly suggesting they were all from the head of Judith Mitchell. From this and other pertinent evidence the jury could believe defendant was in the back room with the victim about the time she was murdered.

Judith Mitchell was shot 4 times in the back and once in the back of her head. Robert Pope, was shot 3 times in the back and once in the neck. All 9 rounds were fired at extremely close range. These facts bespeak intentional considered killings upon which the murderer reflected coolly and fully before shooting. *State v. Terry*, 472 S.W.2d 426 (Mo. banc 1971); *State v. Anderson*, 515 S.W.2d 534 (Mo.1974). The recovered bullets were examined and found to be marked with 6 lines and grooves twisted to the right. It was determined that all were fired from the same gun which could have been a Mark IV High Standard .22 caliber magnum revolver or a Double Nine High Standard. Both are 9 shot weapons.

A shell casing discovered in appellant's car was determined to have been fired by either a High Standard Mark IV or a High Standard Double Nine. In addition, a handkerchief seized from appellant contained a grain of ball type powder of the type commonly used in .22 caliber ammunition. Swabbings taken from defendant's hands at the time he was arrested were analyzed by the neutron activation procedure from which it was determined that he had handled a firearm shortly before his arrest. In May or June, 1975, defendant had accompanied a female friend to a discount store near Leavenworth, Kansas, where he paid for a 9 shot Mark IV High

Standard revolver which was registered in his female companion's name.

While no one piece of evidence in the case was sufficient to convict the defendant of murder in the first degree, there were sufficient facts and circumstances, inconsistent and irreconcilable with his claim of innocence, from which the jury could find defendant guilty on each charge of murder.

■ Defendant argues the evidence was insufficient to establish that Pope had been robbed because no showing was made that property had been taken from him when killed. While this is a troublesome area of the case, the following circumstances have led us to the conclusion that a submissible case was made as to that element of the Pope robbery. Pope was not in the store at 2:05 when Geiter left but was found dead in the store at approximately 2:20 to 2:25. When Geiter left at 2:05 p. m. the only persons in the store were Judith Mitchell and the defendant. It is clear a robbery occurred during the period from 2:05 to 2:20. Since Pope was found dead in the store he must have entered either when the robbery was occurring or shortly before it began and was forced to lie on the floor of the rear room. The store was robbed and the woman in charge was murdered while lying face down near Pope. From this the jury could reasonably infer that robbery to obtain money was the murderer's motive, and that any wallet or money readily obtainable from Pope would also be taken. Furthermore Pope's car keys were found in his hand, indicating he had driven on that fateful trip to the 7–11 Store. Pope's wallet was found the next day in Kansas City, still containing his driver's license.[5] From this, plus the fact his car keys were in his hand when his body was discovered, the jury could believe that he drove to the store

with his wallet, driver's license and car keys in his possession. From all the evidence the jury could conclude the murderer robbed the store and also robbed Pope of his wallet and its contents.

■ Finally, defendant contends the evidentiary chain was broken as to the store robbery under Count II as no showing was made that an "employee" was there and in charge when the money was taken from the store. However, witness Geiter stated the lady he saw in the store between 2:00 and 2:05 was a store *employee* whom he had seen there before but did not know her name. Notwithstanding this testimony defendant argues that though the murdered woman was later identified as "Judith Mitchell" nothing appears to prove "Judith Mitchell" was the employee Geiter saw.

There is no evidence that any person other than the unfortunate Mr. Pope entered the store and no other woman was seen in or leaving the store during this period. The evidence indicates that the woman employee was the only store personnel in attendance. It may be assumed someone would be in charge and the store not left unattended during early afternoon shopping hours. The jury could reasonably infer the live *woman employee* seen by Geiter about 2:05 was the woman (Judith Mitchell) found dead in the back of the store at 2:15 or 2:20 p. m. The evidence was sufficient to support the submissions.

Affirmed.

MORGAN, C. J., and HENLEY and FINCH, JJ., concur.

DONNELLY, J., concurs in result.

BARDGETT, J., dissents for reasons stated in the dissenting portion of his opinion concurring in part and dissenting in part in *State v. Duren,* No. 59914, 556 S.W.2d 11.

---

5. The day following the robbery defendant's wallet and a license plate were found by a passerby on a street in Kansas City, Kansas, who reported this to the police. It was discovered the wallet contained the driver's license of the murdered man, Robert Pope. No further identification of the license plate developed, but Pope's wallet and driver's license were identified by his father.

One of defendant's alibi witnesses testified that defendant has visited him in Leavenworth, Kansas. An employee of the Alco Discount Store in Leavenworth testified that defendant frequented the store. These facts demonstrate defendant has Kansas connections which the jury could consider.

SEILER, J., dissents for reasons stated in his dissenting opinion in *State v. Duren*, No. 59914, 556 S.W.2d 11.