**Robert E. BENSON, Movant-Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 31465.**

Missouri Court of Appeals,
Western District.

Dec. 30, 1980.

Motion for Rehearing and/or Transfer
Denied Feb. 2, 1981.

Application to Transfer Denied
March 9, 1981.

George E. Kapke, Cochran, Kramer, Kapke & Willerth, Independence, for movant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

Before WASSERSTROM, C. J., Presiding, and SHANGLER, PRITCHARD, DIXON, SWOFFORD, SOMERVILLE and MANFORD, JJ.

DIXON, Judge.

This appeal from the denial of post-conviction relief pursuant to Rule 27.26 is one of a series involving the application of the rulings in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Lee v. Missouri*, 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979).

The precise issue raised is the application of *Duren v. Missouri* to cases tried between January 9, 1975, the date when *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), was decided, and September 27, 1977, the date when *State v. Duren*, 556 S.W.2d 11 (Mo. banc 1977), was decided. The question is posed because of the decision in *Lee v. Missouri* which mandates application of the *Duren v. Missouri*, holding to all juries sworn after the *Taylor v. Louisiana* holding. This appeal and seven other such cases were heard by a special panel of seven judges. All the appeals were heard at the same time with argument limited to the *Duren* issues raised.

All the cases have as a common thread an attack upon the composition of Jackson County jury panels as being unconstitutionally faulty by reason of an underrepresenta-

tion of women. The underrepresentation of women occurred by reason of the manner in which the questionnaire process provided by § 497.130 RSMo 1969 operated to exclude females by inviting and almost directing their nonparticipation in the jury system. This questionnaire and its operation was confined to juries selected in Jackson County, and the factual background of *Duren v. Missouri* and *Lee v. Missouri, supra,* inextricably involves the application and effect of § 497.130 RSMo 1969.

Soon after the decision in *Taylor v. Louisiana, supra,* the public defender's office in Jackson County launched an attack upon the method of selection of juries in Jackson County. The attack was focused in *State v. Lee,* 556 S.W.2d 25 (Mo. banc 1977), and *State v. Duren,* 556 S.W.2d 11 (Mo. banc 1977). The evidentiary support for the attack in both of these cases hinged upon the effect which the questionnaire provided by § 497.130 RSMo 1969 had in eliminating females from the jury list. After the evidentiary support for the challenge was compiled for use in *State v. Lee* for the 1975 panel, the "packet" of such information was provided to all assistant public defenders in January, 1976.

*State v. Duren* and *State v. Lee, supra,* reached the Supreme Court of Missouri in 1977, and were both decided September 27, 1977. The claims of both defendants as to the underrepresentation of women on Jackson County juries were rejected by the Missouri Supreme Court. Ultimately, the Supreme Court of the United States, in *Duren v. Missouri, supra,* decided January 9, 1979, accepted the defendant's contention. *Lee v. Missouri, supra,* decided January 15, 1979, made the *Duren* ruling retroactive to the date of decision in *Taylor v. Louisiana.*

The result of these two decisions of the Supreme Court was to open the floodgates to a variety of claims for similar relief by prisoners who had been convicted by Jackson County juries after *Taylor v. Louisiana.*

*Duren v. Missouri* and *Lee v. Missouri* were direct appeal cases in which the error had been fully preserved. These cases and others in the *same* procedural posture were granted relief by memorandum order in compliance with the mandate of the Supreme Court of the United States. *State v. Clark,* 583 S.W.2d 300 (Mo.App.1979); *State v. Hardy,* 578 S.W.2d 361 (Mo.App.1979).

Varieties of procedural default began to emerge in the appeals of other cases. *State v. Buford,* 582 S.W.2d 298 (Mo.App.1979), rejected the State's attack upon the statistical proof offered to show a *Duren* violation, which asserted that the ultimate composition of the wheel was not proven. The rationale of *Buford*—that a fact pattern, once established, continues in the absence of evidence to the contrary—was relied upon in *State v. Hawkins,* 582 S.W.2d 333 (Mo. App.1979), and *State v. Beavers,* 591 S.W.2d 215 (Mo.App.1979) to find *Duren* violations where the factual data offered to support the motion were for a prior year's jury panel. Thus, the principle of *Buford,* that facts once shown are presumed to continue to exist when the system giving rise to the operative facts is shown not to have changed, was applied and broadened.

In a case where a motion to quash the jury panel was filed, but no ruling was made, relief was also granted, *State v. Carter,* 591 S.W.2d 219 (Mo.App.1979), this on the basis that the ruling in *State v. Duren* would have made insistence upon such a ruling futile. Finally, in *State v. Williams,* 595 S.W.2d 378 (Mo.App.1980), a case was reached where no attempt had been made to assert the error procedurally in the trial court, but the issue was raised in the appeal as plain error. Relief was granted under the plain error rule, and the circle was complete.

Only two exceptions were saved: first, the holding of *State v. Mountjoy,* 585 S.W.2d 98 (Mo.App.1979), that plain error would not be applied to such a claim where the trial occurred prior to the decision in *State v. Duren,* a holding which is here affirmed; and, likewise, the holding in *State v. Williamson,* 584 S.W.2d 628 (Mo. App.1979), that error raised for the first time on appeal would not be considered, absent a request for plain error review. *Williams, supra,* has been adopted and fol-

lowed in *State v. Johnson*, 606 S.W.2d 624 (Mo. banc 1980), and in *State v. Baker*, 607 S.W.2d 153 (Mo. banc 1980), and must be considered as settled law.

Our cases have thus pierced any procedural hiatus to give relief in *Duren* type claims for juries sworn between the decisional dates of *State v. Duren* and *Duren v. Missouri*. The ultimate rationale of these cases can only be found in concepts of fundamental fairness and an awareness on the part of this court as to the practicalities of trial practice. After *State v. Duren* and before *Duren v. Missouri*, it is obvious that some lawyers continued to assert *Duren* type claims, but in no case was the attack on the jury as intense and pointed as in *Duren* and *Lee*. Others, acceding to the ruling of the Supreme Court of Missouri in *State v. Duren*, made no attempt to preserve the issue. Only by cutting through the tangle of procedural problems, as *State v. Williams, supra*, succeeded in doing, can substantial justice and fundamental fairness be rendered to defendants tried by juries selected between the decisions in *State v. Duren* and *Duren v. Missouri*. Nor would it be fair to counsel to attempt to sort out claims upon the basis of diligence in the preservation of the claim of error in the light of *State v. Duren* which bound all of the courts of this state until the decision in *Duren v. Missouri*.

■ However, the premises which existed and the rationale for the adoption of the rule set forth in *State v. Williams* and the preceding cases do not apply to cases, including the current one, tried between *Taylor v. Louisiana* and *State v. Duren*. Prior to *State v. Duren*, the application of *Taylor v. Louisiana* to the selection of juries under the Jackson County system of jury selection was an open question. That this is so is demonstrable from the opinion in *State v. Duren*. In *Duren v. Missouri*, the dissent of Justice Rehnquist indicates the issue was not so clear-cut as to be an open and obvious constitutional impairment of the jury selection process. Given the doubt surrounding the issue prior to the decision in

*State v. Duren*, there is no reason to depart from settled principle when dealing with imperfectly preserved claims of error in cases tried before *State v. Duren*. Settled procedure requires that a constitutional attack be made at the first opportunity and preserved at each step of the judicial process. *State v. Wickizer*, 583 S.W.2d 519 (Mo. banc 1979). A challenge to the jury panel or venire must be made at the time the panel is sworn or as soon as the cause for challenge appears. *State v. Sockel*, 485 S.W.2d 393 (Mo.1972); *State v. Robinson*, 484 S.W.2d 186 (Mo.1972); *Lee v. Missouri, supra*.

In all cases on direct appeal prior to *State v. Duren*, the failure to timely object at trial will preclude consideration of a *Taylor v. Louisiana* type claim under the settled procedural rule that such objection must be timely made. The reasons for the application of plain error in direct review cases after *State v. Duren* do not apply to cases prior to that decision. No reason appears to excuse default of timely objection prior to the decision by the Missouri Supreme Court in *State v. Duren*. *State v. Watts*, 607 S.W.2d 787 (Mo.App.1980).

■ It is, likewise, settled law in Missouri that in our post-conviction relief practice under Rule 27.26, a procedural default bars review of even a constitutional claim in a 27.26 proceeding. *Fields v. State*, 468 S.W.2d 31 (Mo.1971). *Fields* relied upon the rationale of *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), that if a legitimate state interest was served by a procedural requirement, it barred federal habeas corpus review and that, therefore, it constituted an independent state ground for decision. Underlying this rationale is, of course, the notion that Missouri should afford state review of constitutional grounds if the failure to do so will require ultimate review by the federal courts. The question has not been posed directly in Missouri with respect to the requirement for a contemporaneous objection to a jury panel, but the reasoning of the Missouri Supreme Court in *State v. Harrington*, 435 S.W.2d 318 (Mo.

1968), in dealing with the failure to file a motion to suppress is equally applicable to the question of a challenge to the jury panel. Such claims with respect to the composition of the jury can only be determined by extraneous proof presented to the trial court and the failure to present such objection and proof at the time prevents the trial court from curing any error in the trial by obtaining a constitutionally permissible jury. In effect, a failure to object and a subsequent right to review under Rule 27.26 would permit the defendant to take his chances with the improperly selected jury and, only in the event of a failure to acquit by that jury, raise the issue in 27.26 proceedings. In fact, the Supreme Court of the United States, in *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), found as a matter of federal law that the failure to object to the composition of a grand jury barred assertion of the claim either in later criminal proceedings in the same case or in any post-conviction claim under federal habeas corpus; and the same rule was applied in *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), with respect to a petit jury. Although *Davis* and *Shotwell* decide only questions of federal procedure, in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court applied the *Davis* principle to federal habeas review of state proceedings, limiting *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

Under the settled principle of waiver by failure to make proper and timely objection, no *Taylor v. Louisiana* claim can be made to a Missouri jury seated prior to *State v. Duren*, absent a proper and timely objection. Whether the claim is asserted on direct appeal, or in a subsequent Rule 27.26 proceeding, the failure to make a timely and proper objection bars review. The instant case, without more, would be decided by the foregoing.

The movant here also asserts that there was incompetence of counsel in failing to file a motion. This requires an examination of the factual setting and the state of the law as it existed at trial.

The state has not been well served in this case by conceding in its brief that the facts stated in the movant's brief are correct and acceptable. The movant's brief does not give the true factual picture which existed at the time of the trial in this case. It is true, as movant's brief relates, that trial counsel for the movant was aware of the decision in *Taylor v. Louisiana* at the time of trial. It is true that the proof offered in support of the motion to quash the jury panels in the *Duren* and *Lee* cases was available in raw form to trial counsel at the time of this trial in May of 1976. A summary of the proof offered in *Lee* and *Duren* is included in the appendix.

Movant's brief, however, omits some additional factual background appearing from the testimony. The public defender, at the time of trial in the instant case, had available over 60,000 questionnaires from potential jurors utilized for the selection of the 1976 jury wheel. The jury wheel would have been the wheel from which weekly panels of jurors were drawn during 1976, including the panel in the instant case. The questionnaires included both responses of persons in the wheel and those who were rejected for one reason or another. An ongoing attempt was being made by the public defender's office to analyze these questionnaires in order to compile factual support for a *Taylor v. Louisiana* claim. This compilation was *not available* until November, 1976, long after the instant case was tried. This effort in progress in the public defender's office was intended to reduce the raw data from the questionnaires to a format suitable for an orderly presentation of the constitutional claim. Trial counsel testified that this effort was being undertaken pursuant to the direction of the Circuit Court of Jackson County concerning the format for such proof.

The records in previous *Duren* cases have made it clear that the circuit court, in a commendable effort to avoid clogging the dockets with such laborious evidentiary procedures as would be required to introduce

and interpret over 60,000 questionnaires, had directed efforts towards summarization of the data. Absent such a common sense approach to the problem, every trial judge in the metropolitan area would have been engaged in hearings involving the raw data on the jury wheel. Trial counsel testified that the only way he could have made a record at the time of trial of this case would have been to physically bring the questionnaires to the circuit court room and physically introduce the questionnaires one at a time and make a record. He further testified that the use of the raw data had been considered but not pursued for the obvious reason that the presentation of some 60,000 questionnaires on a pre-trial motion would have been virtually impossible.

In any event, a decision to attempt such an unwieldy form of proof would almost certainly have resulted in a virtual cessation of criminal trials in the second largest city in the state. The approach adopted by the circuit court was a sensible one in the circumstances. Nor can the public defender's office be faulted for delay in assembling the summary data. They undertook and accomplished a gargantuan task, with the limited manpower in the public defender's office, while at the same time providing the bulk of criminal defense work in Jackson County.

Certain conclusions emerge from the factual background. There was confusion and uncertainty as to both the nature and the quantum of proof necessary to support a *Taylor v. Louisiana* claim. The proof in *Lee* did not and could not have included any proof as to the number of women who had opted out of jury service in answer to the 1975 jury questionnaires since the questionnaires had been routinely destroyed at about the time *Taylor v. Louisiana* was decided. Thus, factual proof as to the operation of the Jackson County system in excluding women was impossible except by inference from the proportion of women on the wheel contrasted with the number of women in the general population. The proof in *Duren* did not improve upon this aspect because the questionnaires applicable to the jury wheel from which the jury wheel in *Duren* had been drawn were not collated at the time of Duren's trial. Although the factual material available was placed in the hands of the assistant public defender, no direction was given to assert the claim in all cases. This strongly suggests that there was uncertainty as to the factual or legal viability of the claim based upon either a lack of proof, or the application of *Taylor v. Louisiana.*

The specific claim of error in the instant case is that the movant's counsel was ineffective by reason of his failure to file an appropriate motion challenging the jury panel and supporting it with the proof available to him at the time. The argument of movant is predicated upon *Seales v. State,* 580 S.W.2d 733 (Mo. banc 1979). The standard of conduct for lawyers is expressed in *Seales* in the following language taken from *Witham v. Mabry,* 596 F.2d 293 (8th Cir. 1979), which in turn relied on *United States v. Hood,* 593 F.2d 293, 297 (8th Cir. 1979):

> "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that he was prejudiced thereby."

Before undertaking consideration of the issue of incompetency of counsel in the case now presented, an important caveat must be noted. The issue of alleged incompetence of counsel in the time period between the decisional dates of *Taylor v. Louisiana* and *State v. Duren* is a completely different issue than the question of such alleged incompetency after *State v. Duren* and before *Missouri v. Duren.* The decision in *State v. Duren* published generally to the bar the issue and the factual data concerning Jackson County juries. The analysis and contentions were thus known and the issue of professional judgment was in an entirely different context. For those reasons, the decisions of this court in discussing or considering claims of ineffective assistance of counsel after *State v. Duren* have no bearing on the issue for the period here in question.

*Seales* presents a bifurcated test for assessing competency of counsel: First, the violation of a standard of *customary* skill and diligence, and second, harm to some substantial right of the defendant. In *Seales, supra,* the Supreme Court of Missouri also adopted the criteria set forth in *Reynolds v. Mabry,* 574 F.2d 978 (8th Cir. 1978), to measure ineffective assistant of counsel. These include a presumption that counsel is competent and that the burden is upon the petitioner or movant to prove incompetence. Rule 27.26(f) explicates this burden as requiring "a preponderance of the evidence." Significant to the issues in this case is the adoption in *Seales* of the language of *Reynolds* :

"Finally, the exercise of reasonable judgment, even when hindsight reveals a mistake in that judgment, does not render a lawyer negligent or lacking in competence in rendering his services." *Reynolds, supra* at 979.

■ Claims of ineffective assistance of counsel may arise in the context of the commission of an act or as in the instant case by the claimed *omission* of an action. Whether the claimed error is one of commission or omission, the initial question of the determination of a failure to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances remains. This will obviously require an examination, in many cases, of the judgment of the lawyer based on the law and the facts. An omission under one set of facts and circumstances might be of no moment; a similar omission may in other circumstances violate the standard. Without extensive analysis of the case law, an example of this concept comes to mind in the treatment of claims of ineffectiveness of counsel in failing to file a motion to suppress. The failure to file such a motion is tested upon the basis of the likelihood that such a motion would have resulted in any relief. *Tollison v. State,* 556 S.W.2d 455 (Mo.App.1977). Such a test may be considered as hindsight, but the hindsight nature of the review does not consider matters of law or fact that could not have been known when the duty to act arose.

This concept is embodied in the language from *Reynolds, supra* at 981, quoting, in part, *Beasley v. United States,* 491 F.2d 687 (6th Cir. 1974):

"Counsel's exercise of competent services cannot be measured in the abstract or in a hypothetical sense. Whether we speak in terms of prejudice or some other standard, *there must still be a reasonable nexus or relationship of the alleged breach of duty with the duty to act under the facts of the case. Counsel does not fail to render effective service if there is little or no likelihood that a reasonable lawyer under similar circumstances would consider the alleged defense reasonably essential to the case.* As the Sixth Circuit has stated, counsel's duty is to assert all apparent 'substantial defenses' available. See *Beasley v. United States, supra* at 696." [491 F.2d 687 (6th Cir. 1974)].

Whatever the formulation of the standard, its application to given fact situations will be difficult. The unending variations in factual settings and the shifting of emphasis arising from the interplay of the substantive principles and the variance in factual setting will ordinarily require continuing case by case analysis in determining the claims of ineffective assistance of counsel.

Despite the foregoing, the commonality in fact and law of cases raising the issue of ineffectiveness of counsel after *Taylor* and before *State v. Duren* permits formulation of a general rule applicable to most such cases.

■ A movant asserting a *Duren* type claim, tried during the period involved, bears the burden of showing that reasonably competent lawyers rendering similar services under existing circumstances would have filed a motion to quash the jury panel and offered proof in support of it.

Hindsight based on the holding in *Duren v. Missouri* has no place in that evaluation. The issue must be considered in the light of whether a reasonably competent lawyer would have considered such a motion a substantial defense reasonably essential to the case at the time of trial. The determination of that question inevitably involves a

professional judgment on the reach and scope of the holding in *Taylor v. Louisiana.* In the light of the holding of the trial courts in *Duren* and in *Lee* and the subsequent affirmance of those trial court holdings in the Supreme Court of Missouri, a determination that a reasonably competent lawyer should have predicted the holding in *Duren v. Missouri* is not possible. Additionally, even if it were determined that such a prediction would have been within the competence of the average practicing lawyer, the additional prediction of the result in our cases eliminating the need for factual proof to support such a motion would have been required. Until *State v. Buford, supra,* no court in Missouri had ever waived the requirement of factual proof as to the composition of the jury wheel actually in dispute before considering a claim that the jury was improperly drawn. There can be no hesitation in saying that a failure to predict the holding in *Buford* does not demonstrate incompetency. Without repetition of what has been said, *Buford* would not have adopted the view that it did absent the peculiar circumstances upon which it was based.

Thus, in any *Taylor v. Louisiana* claim prior to the decision in *State v. Duren,* the lawyer would have to have weighed the *possibility* that *Taylor* might apply to the Jackson County jury system and the difficulty, if not the impossibility of developing a factual background to support such a claim. The difficulties in that proof have been outlined. The appendix to this opinion demonstrates that the proof in *Duren* was subject to criticism by the Supreme Court of Missouri in *State v. Duren.* All of that factual dispute was swept aside in *Duren v. Missouri,* but failure of prediction of that result cannot be said to demonstrate incompetency.

Nor does the effort to mount an attack upon the Jackson County jury selection system in *Duren* and *Lee* demonstrate that any reasonably competent lawyer should have undertaken the same effort, even if the means were at hand. The possibilities of success in that effort were truly speculative and it is obvious that many lawyers considered them futile. The ultimate vindica-

tion of the claim does not render incompetent those who did not believe that the effort would succeed and that is true whether the doubt was on factual or legal grounds.

No lawyer should be found to have been incompetent upon the basis that a professional judgment on this close a question has been determined by hindsight to have been mistaken.

Of course, not all of the lawyers will have had an equality of knowledge of the facts and the law. Some lawyers may have been more knowledgeable about the factual background. Some lawyers may have been more exposed to the disputes concerning the application of *Taylor.* Some lawyers may have been oblivious to the holding in *Taylor* or its factual background. Individual variations of knowledge and opportunity for the exercise of judgment are not the tests to be applied when measuring incompetence of counsel in the setting of the claim here made. The test is that of the *"customary skill and diligence,"* which implies a community standard.

Nor should "hindsight" testimony by trial counsel control the result. Testimony by trial counsel in some cases has indicated a commendable concern about the failure to make a judgment in favor of filing a motion attacking the jury wheel. Such expressions as "I don't know why I didn't," or "no strategic or tactical reasons were present," are understandable self-criticism in the light of the decisions in *Duren v. Missouri* and *Lee v. Missouri,* and the subsequent decisions of this court granting such relief on broad equitable grounds after *State v. Duren.* Such testimony, given after the fact in hearings conducted when the full sweep of the decisions was known, is understandable. The difficulty is that it does not address the issue of the judgment and knowledge of the lawyer at the time the decision was made. Such testimony does not establish the standard; the facts as they existed, and the state of the law as applied with "customary skill and diligence" establish the standard.

For the reasons set forth in this opinion, the failure of a defense attorney to file a

motion to quash under the *Taylor* doctrine will not be deemed ineffective representation as a general rule. The claim of ineffective assistance of counsel must be denied in this case under that general rule.

Movant also raises a separate issue, that the record shows he was convicted of a different offense under Count II than that with which he was charged. He bases this claim upon claimed variations of the description of the charge placed upon the papers in the court file. These abbreviated notations may be conceded not to have included the term, "malice aforethought," which would bring the case within § 559.180 RSMo 1969 (now repealed) and which would support the life sentence defendant received.

There were three key events in the trial of this case at which it was clearly and unmistakenly indicated that the offense prosecuted as Count II was the offense of assault with intent to kill with a deadly weapon with malice aforethought, pursuant to § 559.180 RSMo 1969. In the first place, *the indictment* filed on July 11, 1975, alleged that the movant did "feloniously, wilfully on purpose *and of his malice aforethought*, make an assault, . . . with a certain deadly weapon" on one Roy E. Odom (emphasis added). When this charge was submitted to the jury, as Instruction No. 8, it was denominated as "assault with intent to kill with malice aforethought" and the element of "malice aforethought" was defined in the instruction. The jury found guilt on this instruction and returned the following verdict:

> "As to Count II, we, the jury, find the defendant, Robert Benson, guilty of Assault with Intent to Kill with Malice Aforethought, as submitted in Instruction No. 8.
> We fix the punishment at Life Imprisonment."

■ Movant also argues that the clerk's certification shows he was not sentenced for a crime involving malice aforethought since "aforethought" does not appear in the certified documents. If the actual *judgment entry* made by the Clerk, which is not included in the record, had erroneously omitted the "aforethought" from the description of the offense, that omission would be correctable by an order *nunc pro tunc* to reflect the judgment actually rendered by the court. *Rush v. State*, 439 S.W.2d 504, 505 (Mo.1969); *Winberry v. State*, 542 S.W.2d 368, n. 1 (Mo.App.1976). The judgment entered by the trial court must, of course, be based on the jury verdict.

■ The movant places principal reliance upon the case of *Hardnett v. State*, 564 S.W.2d 852 (Mo. banc 1978). It held that the incomplete references to the crime charged affected the knowing and voluntary character of the defendant's guilty plea. No such misleading effect appears in the instant case.

Evidence of a clear, unmistakable understanding on the part of movant of the charge against him exists in the fact that the motion for judgment of acquittal at the close of State's evidence, the motion for acquittal at the close of all the evidence, and the motion for new trial all asserted as a ground for relief the contention that the State had not proven the required element of "malice aforethought" in its evidence. Absent any misleading effect, *Hardnett, supra*, does not control.

Judgment affirmed.

All concur.

### APPENDIX

From an examination of the relevant portions of the trial transcripts in *Lee* and *Duren* and the reports of decision in those cases, the following appears to be the proof offered in connection with the motions to quash the panel.

In *Lee*, evidence was taken on the motion to quash the jury panel. Seventy thousand questionnaires were sent out and twenty-five thousand names were placed in the wheel.

A computer printout for the 1975 jury wheel was offered and received. No evidence of gender distribution was offered concerning the 1975 jury wheel. 556 S.W.2d at 29. A "jacket" which contained

the names of all jurors who served in June (week of the 2nd) in 1975. The "jackets" for the weeks between June 9 and November 3 were received.

The computer printout for the week of November 17, 1975 (the week of Lee's trial) of the names of people summoned for jury duty was received in evidence. On this list, there were 88 women and 212 men, and the printout did not contain the names of the people excused.

A U. S. Census was received showing gender distribution in population. Sample copies of the official questionnaire and a summons were in evidence.

The procedure followed if a questionnaire was not returned was detailed.

A law intern at the defender's office stated that by his count, there were 12% females called for August 4 juries. He did similar calculations for the remainder of August and the months of September and October. These calculations were received.

Mr. Kramer, Jackson County director of data processing, stated that there were 40,000 "bad questionnaires" returned out of the 70,000 sent, and this included the women who "opted out". The 1974 questionnaires were routinely destroyed and were never examined for the number of females who opted out of jury service.

In *Duren*, the motion to quash the jury panel was filed before selection of the jury.

Defendant's exhibits # 1, 2, 3, and 4 were then marked and received, and they were described as follows:

# 1—A table of jurors summoned in Jackson County for jury service for the month of January, 1976.

# 2—A table of jurors summoned in Jackson County for jury service for the month of February, 1976.

# 3—A summary of the exhibits # 1 and # 2.

# 4—A partial transcript of the proceedings of State v. Lee, containing testimony detailed above.

A motion for new trial was filed, and a hearing was held on the motion. The following exhibits were marked and eventually received into evidence:

(DEFENDANT'S EXHIBIT NO. 1, GENERAL POPULATION CHARACTERISTICS OF MISSOURI, WAS MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT NO. 2, SUMMONS FOR JURY SERVICE, WAS MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT NO. 3, OFFICIAL NOTICE AND QUESTIONNAIRE FOR JURY SERVICE, WAS MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT NO. 4, TABULATION OF DATA OBTAINED FROM LISTS OF JURORS SUMMONED FOR MARCH, 1976, WAS MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT NO. 5, MASTER PRINT–OUT OF 1976 JURY WHEEL, WAS MARKED FOR IDENTIFICATION)

John Fitzgerald was then called by defendant and stated that he was the jury commissioner for Jackson County. He identified Exhibit # 5 as the master jury wheel printout from which jurors were selected for the year 1976, and it was the one currently being used to select juries in Jackson County. The only evidence of gender distribution of the 1976 wheel in *Duren* was an unverified pencil notation showing 29% women made on the computer printout. 556 S.W.2d 11 at 16.

He then identified Exhibit # 6 which was a "folder of our records kept for the week of March the 29th, for jurors summoned for Kansas City and Independence and all the records of trial held pursuant to that week, the actual jurors that did appear, those that did not appear and those that served."

He stated that similar jackets were kept for every week of the year. The weeks of January and February, 1976, earlier trial exhibits # 1 and # 2, were admitted. A tabulation for the March of 1976 jury wheel was offered and received.

An official jury summons and notice of questionnaire were received. Fitzgerald stated between 60,000–70,000 were sent out each October. When returned, these are sorted, and normally after the wheel was compiled, they were discarded. However,

the questionnaires for 1976 (sent out in September of 1975) were in the custody of the public defender's office pursuant to court order.

Fitzgerald stated that the questionnaire was made from the list of registered voters, on a random basis.

Mr. Kramer, director of data processing for Jackson County, stated he was in charge of selecting the names to which the questionnaires were sent. The list was compiled by selecting every 4th name on the voter registration polls. Personnel then sort out the persons who qualify for exemptions from service; no record is kept of the reasons given for exclusion. No other public record was used to select the names.

The 1970 census for Missouri and Jackson County showing a breakdown of men and women was then offered and received.